IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

CYNTHIA BARNES,

        Plaintiff,

Vs.

                                        No. 13-1019-SAC

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

MEMORANDUM AND ORDER

This is an action reviewing the final decision of the defendant Commissioner of Social Security ("Commissioner") that denied the claimant Cynthia Barnes' ("Barnes") current applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") for the period from December 12, 2008 through June 30, 2011, the claimant's last insured date, and for supplemental security income benefits under Title XVI of the Act. Following a hearing on May 12, 2011, (R. 40), and a supplemental hearing on July 13, 2011, (R. 29), the administrative law judge ("ALJ") issued his decision (R. 10-22), finding the following severe impairments: obesity, bi-polar disorder, and paranoid schizophrenia. The ALJ's conclusion was that Barnes was not disabled as she had the residual functional capacity ("RFC") to perform medium work with certain exertional limitations, with the ability only to "follow unskilled instructions," and with "limited interaction with others." (R. 15). The

Appeals Council denied Barnes' request for review, so the ALJ's decision stands as the Commissioner's final decision. (R. 1-6). With the administrative record (Dk. 10) and the parties' briefs on file pursuant to D. Kan. Rule 83.7.1 (Dks. 11, 14, ad 15), the case is ripe for review and decision.

## STANDARD OF REVIEW

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." The court also reviews "whether the correct legal standards were applied." *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Persales*, 402 U.S. 389, 401 (1971) (quotation and citation omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The review for substantial evidence "must be based upon the record taken as a whole" while keeping in mind "evidence is not substantial if it is overwhelmed by other evidence in the record." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citations omitted). In its review of "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, . . . [the court] will not reweigh the evidence or substitute . . . [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted).

The court's duty to assess whether substantial evidence exists: "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.'" *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (quoting *Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir. 1985)). At the same time, the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d at 1084 (internal quotation marks and citation omitted). The court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been made." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted).

By statute, a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy. . . ." 42 U.S.C. § 423(d)(2)(A).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The first step entails determining whether the "claimant is presently engaged in substantial gainful activity." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted). The second step requires the claimant to show he suffers from a "severe impairment," that is, any "impairment or combination of impairments which limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (internal quotation marks and regulatory citations omitted). At step three, the claimant is to show his impairment is equivalent in severity to a listed impairment. *Lax*, 489 F.3d at 1084. "If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work." *Id*. Should the claimant meet his burden at step four, the Commissioner then assumes the burden at step five of showing "that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy" considering the claimant's age, education, and work experience. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010) (internal quotation marks and citation omitted). Substantial evidence must support the Commissioner's showing at step five. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

**ALJ'S DECISION**

At step one, the ALJ found that Barnes had not engaged in substantial gainful activity from December 12, 2008, the alleged onset date, through August 31, 2009, but that Barnes had engaged in substantial gainful activity from September 1, 2009, through March 31, 2010, and was not under a disability during this period. (R. 13). The ALJ completed step one with finding that Barnes had not engaged in substantial gainful activity from April 1, 2010, through June 30, 2011, (the last insured status date), or through the date of the ALJ's decision in October of 2011. (R. 14). At step two, the ALJ found the claimant to have the following severe impairments: "obesity, bi-polar disorder; and paranoid schizophrenia." (R. 14). The ALJ for step three determined that the claimant's mental impairments did not meet or medically equal the criteria of listings 12.03 and 12.04. (R. 14).

Before moving to steps four and five, the ALJ determined that Barnes has the following residual functional capacity ("RFC"):

> to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). She can lift/carry up to 50 pounds occasionally and 25 pounds frequently. There is no limit on sitting, standing, or walking. She can occasionally stoop/bend, kneel, crouch, crawl, and climb ramps and stairs but must avoid climbing ladders and scaffolds. She must avoid unprotected heights. She is able to follow unskilled instructions but needs limited interaction with others.

(R. 15). At step four, the ALJ found the mental limitations concerning instructions and limited interaction precluded all past relevant work. (R. 20).

5

At step five, the vocational expert provided testimony from which the ALJ concluded that, "the clamant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," such as the collator operator, inserting machine operator, ticket printer and tagger. (R. 21-22). A decision of "not disabled" was filed.

**ERROR IN WEIGHING OPINION OF TREATING MENTAL SOURCES**

In this circuit, it is well settled that "the opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (internal quotation marks and citations omitted). A treating physician's opinion is entitled to such weight due to the unique perspective afforded in the treating relationship "that cannot be obtained from the objective medical findings alone." *Id*. As a general matter, the greatest weight is given to the treating physician's opinion with less to the examining physician and even less to an agency physician. *Id*. An ALJ is not to "pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." *Robinson*, 366 F.3d at 1083. The same holds true as between different medical reports. *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).

The ALJ's evaluation of a treating physician's opinion follows a

6

sequential analysis:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. For this, she "must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* [ *Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir.2003] ) at 1300 (internal quotation marks omitted). If it is not, then the opinion is not entitled to controlling weight. If it is, then the ALJ must further determine whether the opinion is "consistent with other substantial evidence in the record." *Id.* We have held that an ALJ must make a finding as to whether the physician's opinion is entitled to controlling weight "so that we can properly review the ALJ's determination on appeal." *Id.*

*Jones v. Colvin*, 2013 WL 1777333, at *3 (10th Cir. 2013). Should the treating physician's opinion not be given controlling weight, the ALJ then must specify what lesser weight is assigned the treating physician opinion. *Robinson v. Barnhart*, 366 F.3d at 1083. Even if not entitled to controlling weight, the treating source opinion is still entitled to deference and is to be weighed using all of the following factors:

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
> (3) the degree to which the physician's opinion is supported by relevant evidence;
> (4) consistency between the opinion and the record as a whole;
> (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and
> (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300–1301 (10th Cir.2003). After considering the above factors, the ALJ must give good reasons for the weight

7

ultimately assigned to the opinion. If the ALJ rejects the opinion completely, then specific, legitimate reasons for doing so must be provided. *Watkins*, 350 F.3d at 1301.

In June of 2008, Barnes was admitted to a mental health facility pursuant to an ex-parte emergency custody order. (R. 346). While Barnes said she did not know why she had been admitted, the hospitalization was required when her case managers noticed increased symptoms of hallucinations, paranoia, and threatening conduct from her non-compliance with medications. *Id*. After almost three weeks of treatment in the facility, her condition had improved and she was diagnosed with a current GAF of 55 and discharged as "stable" with the recommendation of ongoing treatment as Wyandot Center. (R. 350-51).

A year later in June of 2009, the Wyandotte County District Court revoked Barnes' outpatient treatment order, and she was taken to the Osawatomie State Hospital. (R. 337). She was becoming aggressive toward others and refusing to take her medication. *Id*. On her discharge from the hospital, her GAF score was 40 and the prognosis was "[g]uarded due to chronic mental illness and limited compliance with healthcare services in the community." (R. 339-40). Barnes was transferred to the Rainbow Mental Health Center. The physicians at this facility noted that Barnes "is somewhat a poor historian as she is very evasive when answering questions from the

8

examining physician." (R. 352). The "significant past psychiatric history" noted in those records is:

> The patient has been diagnosed with schizophrenia paranoid type. She has multiple admissions to Osawatomie State Hospital, Rainbow Mental Health Facility, and state facilities in California. She has a history of noncompliance with medication.

(R. 353). She was discharged in July with guarded prognosis, a GAF score of 55, and a recommendation of follow-up treatment at Wyandot Center.

Throughout this period and up to the date of the Commissioner's decision, Barnes received her community mental health care at the Wyandot Center under the supervision of the staff psychiatrist, Dr. Bal Sharma, M.D. Shortly after Barnes' July 2009 release from the Rainbow facility, she was seen by Dr. Sharma for prescription refills, and physician recorded her insight and judgment as "good" and her condition as "stable" from a psychiatric standpoint. (R. 320). On March 21, 2011, Dr. Sharma signed a completed medical source statement-mental and checked every box indicating that Barnes was markedly limited and indicated that his opinion was based on medical history, clinical findings, mental status examinations, diagnosis and treatment. (R. 482-83).

The ALJ found Dr. Sharma's opinion was "not entitled to any weight" as being "inconsistent with record as a whole." (R. 19). The ALJ was critical of Dr. Sharma's use of a "check box" form "without any accompanying explanation." (R. 19). Insofar as inconsistencies with the record, the ALJ cited

9

Dr. Sharma's mental status examinations from March, April and May of 2011, the fact that Barnes had not been hospitalized since June of 2009, and the circumstance of the Wyandot Center still offering vocational counseling to Barnes from "at least 2007." (R. 19). The claimant challenges that the ALJ's finding of no weight to Dr. Sharma's opinion is not sustained by specific and legitimate reasons, and that the evidence of record is contrary to the ALJ's findings.

"The Tenth Circuit has expressly declined to adopt a categorical rule that check-box forms completed by treating physicians can be rejected as unsupported by substantial evidence." *Salazar v. Colvin*, 2013 WL 5418048 at *4 (D. Colo. 2013) (citing *Anderson v. Asture*, 319 Fed. Appx. 712, 723 (10th Cir. 2009), and *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008)). The Commissioner "cannot reject a treating physician's opinions simply because it was rendered on a check box form without explanation." *Domann v. Astrue*, 2012 WL 1893549 at *6 (D. Kan. 2012) (citing *Anderson*, 391 Fed. Appx. at 723). Thus, the ALJ's rejection of Dr. Sharma's opinion cannot rest upon his use of a check-box form. Instead, the ALJ's evaluation of the opinion should look to what Dr. Sharma offered as factors in support of his opinion-- medical history, clinical findings, mental status examinations, diagnosis, and treatment.

From Dr. Sharma's progress notes on March 1, 2011, the ALJ

10

quotes Barnes' statements that she was "doing very well" and "taking medication" and other positive comments about current status. (R. 19). To rely on Barnes' own observations about her mental health to discredit Dr. Sharma's opinion presumes that Barnes can offer reliable insight into own condition and needs. The ALJ does not cite evidence to sustain this presumption, and the evidence of record fully contradicts it. When hospitalized in 2008, Barnes said, "I'm not sure why I'm here," (R. 346), and in the 2009 hospitalization, the treating doctor observed that Barnes was a "poor historian" and "evasive" in answering the physician's questions (R. 352). Barnes mental health review team wrote the district court in December of 2009:

> Cynthia continues to believe that she can manage her mental illness by herself; and so she intermittently stops her medications without telling anyone. It is only when she once again becomes symptomatic and gets confronted about it that she fesses up to her noncompliance.

(R. 464). In January of 2010, Barnes was angry about the court order requiring her to take medication and argued that the clinic and court order was "wasting her life." (R. 904). In March of 2010, her case manager wrote that Barnes was "showing signs of not being on medication, but [she] reports that she is taking medication daily." (R. 912). Later that month, Barnes even told her case manager that the medications were not helping her. (R. 914). In June of 2010, the case manager noticed that Barnes appeared "fidgety and nervous" and inquired about her medication compliance and the court order. (R. 1010). Barnes became agitated about the topic of the court order, and Barnes

11

suggested the possibility of loading up her car and just leaving the state. *Id.* Noticing in August of 2010 that Barnes was struggling with hygiene, the case manager learned that she was not taking medications on the weekend because she was not being prompted by others. (R. 1246). As of April of 2011, Barnes remained on an outpatient court order and a plan of care that included attending weekly case manager meetings to manage and cope with symptoms and scheduled med clinic appointments (with daily contact reminders) and pursuing a goal of obtaining a full or part time position in the customer service field. (R. 1748-49). The overwhelming evidence of record is that Barnes lacks judgment and insight into her condition, her need for medication, and her need for a court order requiring her to receive ongoing outpatient treatment and medication. There is not substantial evidence to sustain the ALJ's conclusion that Barnes' opinion of her condition reasonably contradicts Dr. Sharma's opinion.

In singling out Dr. Sharma's mental status examination notes from March, April and May of 2011 as contradicting Dr. Sharma's disability opinion, the ALJ failed to consider that opinion within the context of the entire medical record. Indeed, the court concludes there is not substantial evidence of record to support the ALJ's finding that Dr. Sharma's opinion "is inconsistent with the record as a whole." (R. 19). Based on his diagnosis made on March 29, 2010, Dr. Sharma prepared a later "diagnosis summary" dated and signed on July

12, 2010, in which he recorded, "Bipolar I Disorder, Most Recent Episode Manic, Severe With Psychotic Features" as evidenced by "hx of manic sx-pressured speech, increased energy, decreased need for sleep, impulsivity, hx of depressed, sx-excessive sleep, increased appetite, decreased interest in hobbies, SI, some paranoia." (R. 476). All of the described symptomology is consistently confirmed in the weekly reports of the case managers and vocational counselors in 2009, 2010 and 2011. Most importantly, Dr. Sharma's diagnosis summary includes for Axis V the "highest GAF in the Past Year" as 42.[1] *Id*. A GAF of 42 is plainly consistent with Dr. Sharma's opinion that Barnes is markedly limited in all categories. A quick comparison of Dr. Sharma's contemporaneous mental status examination notes of March 19, 2010, shows them to be nearly identical in content with those from 2011 which

---

[1] "A GAF score of fifty or less, however, does suggest an inability to keep a job." *Nguyen v. Astrue*, 2010 WL 2628641 at *6 n.7 (D. Kan. 2010). GAF scores between 41–50 indicate, "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Clark v. Astrue*, 2012 WL 4856996 at *10 (D. Kan. 2012) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed. text revision 2000). The Tenth Circuit has framed the weight of such evidence within this context:
> Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work. *Eden v. Barnhart*, 109 Fed. Appx. 311, 314 (10th Cir. 2004) (unpublished). The claimant's impairment, for example, might lie solely within the social, rather than the occupational, sphere. A GAF score of fifty or less, however, does suggest an inability to keep a job. *Oslin v. Barnhart*, 69 Fed. Appx. 942, 947 (10th Cir. 2003) (unpublished).

*Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004) (unpublished).

the ALJ cited as inconsistent with Dr. Sharma's opinion of marked limitations. (R. 451). Thus, the medical record demonstrates the ALJ's reading of Dr. Sharma's mental status examination notes is inconsistent with Dr. Sharma's apparent intent of noting what is stable, appropriate and good for Ms. Barnes from her particular psychiatric standpoint. There is nothing in the record to sustain the ALJ's speculation that Dr. Sharma's use of stable, appropriate and good as any indication of Ms. Barnes' capacity for full-time work. Indeed, as the record fully demonstrates, Ms. Barnes' stabilization depended upon a full management team that included Dr. Sharma for monthly reviews of medication needs, a case manager for weekly appointments, a vocational counselor, and daily medication reminders.

The ALJ discounted Dr. Sharma's opinion also because "[t]here has been no inpatient hospitalization since June 2009, no emergency room visits, no unscheduled visits at the Wyandot Center, and minimal change as to types/dosages of medication or frequency of treatment." (R. 19). And then noting the frequency of vocational counseling, the ALJ speculates "whether Dr. Sharma would permit the waste of time and money as to this effort if the claimant were 'markedly limited' as to work function." (R. 19). In response, the plaintiff rightly highlights this Tenth Circuit authority:

> "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments,

> speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotations omitted) (emphasis added). Although we may not second-guess an ALJ's credibility judgments, such judgment by themselves "do not carry the day and override the medical opinion of a treating physician that is supported by the record." *Id.* at 318. In this case, the ALJ's unfounded doubt that Dr. Luc agreed with the assessment he signed, in the face of unrefuted evidence to the contrary, was error.

*McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002). Instead of citing any medical evidence of record confirming any improvement in condition, the ALJ presumes the same because the claimant's mental health management team has stabilized her condition such that she is not experiencing serious episodes requiring hospitalization. Throughout this period, the claimant, however, has remained under court-ordered outpatient treatment and under the supervision of a case management team that notes ongoing symptomology even with consistent medication management--"major issues with her hygiene," "decreased" levels of functioning, "fidgety, confused at times," and "somewhat restricted" affect (R. 930, 1448, 1462, 1528, 1568). As far as the ALJ's speculation over Dr. Sharma's real opinion of Barnes' disability from what would otherwise be "waste" in offering vocational counseling, the notes of the case manager and vocational counselor plainly evidence that all of these efforts are part of Barnes' ongoing mental health treatment plan. Even when Barnes complained that she had applied for every job and had nothing to show for it, her case manager praised her for continuing to look for work and encouraged her to keep trying. (R. 1831). If such speculation were worthy of

15

discrediting Dr. Sharma's opinion, then the ALJ did not draw any parallel competing inferences from the case manager's assistance and support of Barnes' decision to appeal her social security disability case, the manager's help in filling out the appeal forms, and the manager's advocacy on Barnes' behalf at the SSA office. (R. 1284, 1759). In sum, the substantial evidence of record does not sustain the ALJ's decision to give no weight to Dr. Sharma's opinion.

The court reaches the same conclusion with regards to the ALJ's finding to give no weight to Dr. Kravitz' opinion on Barnes' inability to work without accommodations. The ALJ cites Barnes' ability to work full time at Wal-Mart and also cites Barnes' decision to quit because of urinary problems and not any mental condition. The ALJ gives a record citation that does not sustain his finding on the reason for Barnes' employment ending at Walmart. At the 2011 hearing before the ALJ, Barnes did testify that she quit working at Walmart due to urinary problems. (R. 44). The record, however, does not show this to be substantial evidence of Barnes' ability to work that is contrary to Dr. Kravitz' opinion. Barnes' case manager took progress notes contemporaneous with Barnes' Wal-Mart employment, and they her increasing mental health symptoms and struggles during this period. Two months before her termination at Wal-Mart, Barnes told her case manager that she had quit because of multiple stressors at her job but her case manager encouraged her

to call her employer to see if she was still employed. (R. 900). At that point, the employer decided to write up Barnes and allow her to stay employed. *Id.* While Barnes returned to work, she continued to deny the need for medication management. (R. 904). A couple weeks before her employment ended, Barnes met with her vocational counselor and was struggling with delusional thinking and seeking assistance on keeping her job. (R. 910). On a meeting with her case manager on March 4th, Barnes presented with increased symptoms, broad affect, humming to herself, and poor hygiene (R. 912). The case manager wrote, "Clt showing signs of not being on medication, but reports that she is taking medication daily." *Id.* Barnes then revealed that she had not shown up for work for "multiple days" and will be "terminated." *Id.* Barnes showed up the next week again "struggling with symptoms," and she told her case manager that medications were not helping her. (R. 914). The case manager noted a flat affect, humming and decreased functioning. *Id.* A month later, Barnes presented as "struggles to manage symptoms during daily living," "inappropriate" affect, "laughing at odd times, fidgety" and apparently not taking her medication. (R. 920). Considering these contemporary medical records of the claimant's mental health condition at the time of her employment, the ALJ's finding that Barnes' simply quit her employment because of incontinence is overwhelmed by contemporaneous and detailed records.

As to Dr. Kravitz, the ALJ again repeated his speculation that the vocational records suggest that the counselors did not believe she is disabled. While Barnes worked at Wal-Mart, her counselor visited her at work and helped her process feelings and duties, (R. 1134), and also noted that Barnes had been stable on the job for 30 days. (R. 1136). The very next week, Barnes stopped taking her medications and began "having very disruptive increased" symptoms. (R. 1138). That same month, Barnes presented with increased symptoms, depressed and irritable and decreased functioning. (R. 1142). Not only were their struggles during her Wal-Mart employment, but Barnes' vocational records are replete with references to her impulsivity, poor hygiene, anxiety, disorganized, indecisive, fear, lack of focus, all of which are symptoms of her mental illness. Despite months of job applications, she obtained only one job after the Wal-Mart employment, and she did not return after the first day of orientation. (R. 1448). The record, at best, shows that the claimant wants to work and that her counselors and managers use the prospect of employment and the court order as motivators to keep her compliant with medication. There is nothing in those records that sustains the ALJ's speculation that the vocational counselors and case managers are of the opinion that Barnes has the mental health capacity to perform sustained full-time employment.

As fully discussed and outlined above, the ALJ's reasons for

18

according no weight to Dr. Sharma's opinion on marked limitations and to Dr. Kravitz' opinion on Barnes' inability to work without accommodations are not supported by substantial evidence of record. There is little of record to assure the court that the ALJ looked to all the relevant factors and considered all the medical evidence in evaluating these medical opinions. The case must be reversed for further proceedings. On remand, the ALJ should take the opportunity to revisit his credibility findings on Barnes in light of the court's discussion of medical records showing her poor insight into her mental health issues and showing the court-ordered, extensive case management given Barnes and her ongoing symptomatology despite this care and medication.

IT IS THEREFORE ORDERED that the decision of the Commissioner is reversed and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this memorandum and order.

Dated this 25th day of February, 2014, Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge